288 N.J. Super. 102 (1996)
671 A.2d 1096
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
RICHARD BARONE, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued October 25, 1995.
Decided March 4, 1996.
*106 Before Judges STERN, WALLACE and NEWMAN.
J. Michael Blake, Assistant Deputy Public Defender, argued the cause for appellant (Susan L. Reisner, Public Defender, attorney; Mr. Blake, of counsel and on the brief and reply brief).
*107 Janet Flanagan, Deputy Attorney General, argued the cause for respondent (Deborah T. Poritz, Attorney General, attorney; Ms. Flanagan, of counsel and on the brief).
The opinion of the court was delivered by STERN, J.A.D.
The primary issue raised on this appeal is whether defendant can be prosecuted in New Jersey for state criminal violations revealed to a federal prosecutor in exchange for an agreement by that prosecutor that defendant would not be prosecuted by "the government" for the crimes he disclosed. We must also consider the impact of inconsistent federal and state court fact-finding concerning the crimes he revealed and whether the agreement was breached. We hold that the defendant's State indictment for theft offenses must be dismissed in these circumstances involving the absence of any formal state charges prior to his cooperation in the federal prosecution and a federal judge's findings that those offenses were revealed to the federal prosecutor and that federal law enforcement officers breached the agreement in a manner which contributed to his state indictment. Accordingly, we reverse defendant's convictions for theft but affirm his unrelated convictions for simple assault and false imprisonment.

I.
Defendant was convicted in the Law Division of conspiracy to commit theft, N.J.S.A. 2C:5-2 and 20-3, (count one), two counts of theft by unlawful taking, N.J.S.A. 2C:20-3, (counts two and twelve), two counts of simple assault as a lesser included offense of aggravated assault, N.J.S.A. 2C:12-1a (counts nine and seventeen), and false imprisonment, N.J.S.A. 2C:13-3, as a lesser included offense of criminal restraint (count nineteen). He was found not guilty of nine other charges, and the jury deadlocked on four additional counts. The charges on which defendant was acquitted involved allegations of wrongdoing (including theft by extortion, terroristic threats, kidnapping, criminal restraint and *108 aggravated sexual assault) directed towards his former girlfriend, P.C., who was the victim of the disorderly persons offenses of which he was convicted. P.C. was a principal in the thefts of which defendant was convicted and cooperated with State prosecutors in the trial of the State case.
Defendant was sentenced to concurrent terms of four years each in the custody of the Commissioner of Corrections on the theft convictions. The conspiracy conviction was merged therein, and defendant received suspended sentences on the remaining convictions. Defendant was ordered to pay restitution in the amount of $47,313 for the thefts, and a $30 V.C.C.B. penalty for each conviction.
After the counts on which the jury could not reach a verdict were dismissed, defendant appealed from the convictions entered against him. On this appeal, he argues:
POINT I DUE PROCESS AND FUNDAMENTAL FAIRNESS REQUIRE THE DISMISSAL OF THE INDICTMENT BECAUSE THE DEFENDANT PLED GUILTY IN FEDERAL COURT PURSUANT TO A PLEA AGREEMENT WHICH REQUIRED HIM TO DISCLOSE ALL HIS KNOWLEDGE CONCERNING ANY CRIMES IN RETURN FOR WHICH HE WAS PROMISED THAT NO ADDITIONAL CHARGES WOULD BE BROUGHT AGAINST HIM FOR THE CRIMES HE DISCLOSED.
A. The New Jersey Court's Conclusion That Defendant Did Not Disclose His Involvement In The Casino Thefts To Federal Agents Prior To The Trial of Joseph Merlino Is Not Supported By Any Evidence And Is Clearly Mistaken And Plainly Unwarranted.
B. Due Process and Fundamental Fairness Mandate Recognition by Our State Courts That The Defendant Received Transactional Immunity By The Plea Agreement He Entered Into With The Federal Government.
C. If The Non-Prosecution Agreement Is Viewed As Granting Defendant Use And Derivative Use Immunity, The Indictment Must Be Dismissed Because The State Has Failed to Show Clearly And Convincingly That Its Prosecution Of Defendant Was Totally Independent Of Defendant's Compelled Admissions.
POINT II THE DEFENDANT WAS DENIED A FAIR TRIAL BY THE ADMISSION OF EXTENSIVE EVIDENCE OF CRIMES NOT INCLUDED IN THE INDICTMENT, HEARSAY EVIDENCE AND BROAD EXPERT EVIDENCE REGARDING BATTERED WOMAN'S SYNDROME WITHOUT ADEQUATE OR SUFFICIENT LIMITING INSTRUCTIONS. (U.S. CONST. AMEND. XIV; N.J. CONST. (1947), ART. I, PAR. 7; N.J. CONST. (1947), ART. I, PAR. 10).

*109 A. Battered Woman's Syndrome
B. Other Crimes Evidence
POINT III THE COURT ERRED IN IMPOSING A FOUR YEAR SENTENCE AND IN IMPOSING RESTITUTION IN THE AMOUNT OF $47,313.00 WITHOUT HOLDING A HEARING AS TO THE DEFENDANT'S ABILITY TO PAY.
The first point is directed to the convictions on counts one, two and twelve related to the theft of money in 1985 and 1986 from a Trump casino and the Golden Nugget Casino in Atlantic City. The remaining convictions relate to defendant's relationship with P.C.
As noted at the outset, we find merit to defendant's claim that the theft charges (and the related conspiracy) should have been dismissed on his pretrial motion. Accordingly, we reverse the judgment as to those convictions. We find no basis for disturbing the other convictions or sentences imposed thereon. Our disposition which vacates the custodial sentences and restitution order moots the sentencing issues. It also dissipates any illegality attributable to the non-custodial sentence imposed on the remaining convictions in light of the custodial sentence simultaneously imposed on the theft convictions. See N.J.S.A. 2C:44-5f(1).
In light of our disposition, we need not detail the proofs at trial. There is not the slightest suggestion of evidentiary insufficiency to support each conviction. In essence, defendant was convicted of offenses related to the mistreatment, abuse and beating of his girlfriend, P.C., with whom he conspired to steal money from the cashier's cage of the casinos where she worked. When defendant's confederate went to the cage to obtain change, P.C. would place $100 bills "in a one dollar bill wrapper using single dollar bill[s] on each side to mask for the camera." Defendant was found to have stolen approximately $22,495 on November 17, 1985 from the Trump Plaza Casino and approximately $24,818 from the Golden Nugget Casino on June 15, 1986.

II.
We find no prejudicial error warranting reversal of the simple assault and criminal restraint convictions. While defendant *110 challenges aspects of the battered woman syndrome testimony, the fact the jury convicted him of only lesser included nonindictable offenses  and acquitted him of offenses to which that testimony related  evidences, in our view, the lack of harmful error warranting reversal. Moreover, from his opening and in his testimony defendant admitted his role in the thefts and his testimony to that effect in federal court. Thus, assuming some error, the "other crimes" evidence, like the battered woman syndrome testimony, had no harmful impact resulting in the convictions. Even though the charges involving P.C. as a victim were developed when she sought to cooperate with the State after her financial records were subpoenaed in 1990, defendant does not contend that the simple assault and criminal restraint prosecutions were barred by his agreement with the federal prosecutor. We affirm those convictions.

III.
Defendant contends that he was given transactional immunity from prosecution for the conspiracy and thefts when he signed a plea agreement with federal prosecutors. The State claims that he merely entered into an agreement "involving a promise by the federal government not to prosecute" him in federal court.
Defendant and Joseph Merlino were indicted in the United States District Court for the Eastern District of Pennsylvania for conspiracy, 18 U.S.C. § 371, theft from an interstate shipment, 18 U.S.C. § 659, and aiding and abetting the receipt of money taken from an interstate shipment, 18 U.S.C. § 2. On November 3, 1989, defendant entered into a written negotiated "plea agreement" pursuant to Rule 11 of the Federal Rules of Criminal Procedure, and entered guilty pleas to the conspiracy and theft charges. The eleven page agreement signed by defendant, his attorney, the Chief of the Criminal Division of the United States Attorney's Office and the prosecuting attorney, provided that, in exchange for promises made by the government, defendant would testify against Merlino. Additionally, he would "cooperate fully *111 and truthfully with the Government" and "be fully debriefed concerning his knowledge of, and participation in, the theft of currency from an armored truck on September 23, 1987 and other crimes about which he has knowledge."
The plea agreement also provided that if defendant cooperated with the government and cooperated in the preparation and presentation of the Merlino trial, the government would advise the sentencing judge of "the good faith cooperation provided by the defendant" and "provide the defendant with the opportunity to apply for admission to the federal witness protection program." The agreement further provided:
It is agreed that the government will bring no additional charges against the defendant for criminal conduct related to activity which he has disclosed during proffer sessions with federal agents prior to the entry of his guilty pleas.
In order for the government to evaluate whether the agreement was worth pursuing, a proffer session was held on November 2, 1989. At that time defendant and his federal attorney met with Robert Goldman, an Assistant United States Attorney, and FBI agents Donald Rochon and Robert Bazin. According to his federal attorney, defendant discussed the charges embodied in the federal indictment and all "other crimes about which [defendant] had knowledge." Defendant and his federal attorney insist that he discussed the two thefts from the Atlantic City casinos during the proffer session.
Defendant testified against Merlino at his federal trial on January 10, 1990. It is uncontested that on cross-examination, defendant implicated himself in the casino thefts, apparently in the context of an attack on defendant's credibility by virtue of his plea agreement. A transcript of neither the federal trial nor the federal post-conviction proceedings has been presented to us. On April 18, 1990 defendant was sentenced to a custodial sentence of "one year and one day" for the conspiracy and to three years probation for the theft.
Defendant was indicted by the State of New Jersey for the two casino thefts and other offenses in November 1990. The grand *112 jury transcripts reveal that the matter was presented earlier that month. As a result of the State indictment, defendant's enrollment in the federal witness protection program was barred. Because defendant sought entry into the program and claimed that the bar stemmed from a breach of the agreement with federal law enforcement officers, who provided information to New Jersey authorities, defendant sought relief from the federal trial judge before whom he pled and was sentenced. Accordingly, an evidentiary hearing was conducted by United States District Judge Norma Shapiro "into whether the government breached its plea agreement with the defendant, Richard Barone, and, if so, to what remedy the defendant is entitled at this time." United States v. Barone, 781 F. Supp. 1072, 1073-74 (E.D.Pa. 1991).
After conducting "an in camera review of the file of the Federal Bureau of Investigation" and taking the testimony of "the investigative agents," id. at 1074, Judge Shapiro found that defendant had disclosed his involvement in the casino thefts during the proffer session. Id. at 1075. She also found that the FBI agents in Philadelphia who were privy to defendant's disclosures "kept their fellow agents in southern New Jersey informed of the case developments." Ibid. She found that through his contacts at the FBI office, retired FBI agent Jack Tuttle, the Director of Surveillance for Bally's Grand Casino, learned of information defendant had revealed, and relayed the information to Investigator Carl Gravel of the Casino Prosecution Section of the Division of Criminal Justice. Id. at 1075-1076. She further found that in December 1989, FBI Agent Rochon contacted defendant, who was then living in protective custody, and advised defendant that the New Jersey authorities wished to speak with him about the casino thefts, but that Rochon had "prevented them" from speaking to defendant "at that time." Id. at 1075.
Judge Shapiro also found that "the otherwise unexplained reactivation of the New Jersey investigation of the casino thefts followed shortly after the time of Mr. Barone's debriefings by the FBI, and preceded his public testimony" and that nothing which *113 occurred in court or which was publicly reported at that time "referred to Mr. Barone's involvement in the casino thefts." Id. at 1076. The judge also referred to defendant's federal pre-sentence report which noted that defendant had admitted to a "scamming" incident with P.C. which had taken place at the Golden Nugget Casino, and that the federal "prosecutor advised that the Federal Bureau of Investigation has notified the victims of these crimes and the defendant's admission of guilt." Id. at 1076. The judge further noted that this fact was never contested by the federal prosecutor who reviewed the presentence report at sentencing. Id.
Judge Shapiro concluded that the FBI agents violated the plea agreement which provided that the government would bring no additional charges against defendant for matters disclosed during his proffer session. Id. at 1077. She found that
38. After the 1989 proffer and before any public disclosure of Mr. Barone's admitted involvement in casino thefts in early 1990, New Jersey authorities inexplicably resumed an investigation into casino thefts occurring in 1985 and 1986. At that time, Mr. Barone's only admissions had been made privately to federal officials in connection with his plea agreement.
39. Defendant has shown by a preponderance of the evidence that agents of the FBI, intentionally or recklessly, indirectly violated the provisions of Mr. Barone's plea agreement that the government would bring no additional charges against him for matters disclosed during his proffer sessions, and that he would be allowed to apply for the federal witness protection program.
[Ibid.]
Based upon her findings, Judge Shapiro made conclusions, which included:
2. Mr. Barone did not breach the plea agreement. Accordingly, under Fed. R.Crim.P. 11(e)(6) and Fed.R.Evid. 410, nothing he said during any proffer session prior to entering his plea is admissible against him in any court. Likewise, disclosure of such statements to state authorities indirectly violated his rights under these Federal rules.
[781 F. Supp. at 1078.]
The judge also concluded that defendant "is entitled to be readmitted to the Witness Protection Program as soon as he becomes eligible." Ibid. In her discussion of the issue, she said:

*114 Since the Government cannot be permitted to accomplish indirectly what it is bound not to do directly, taking action likely to cause the State of New Jersey to bring charges against Mr. Barone the federal government would be barred from bringing, is a violation of the plea agreement, especially where the consequence of state charges is the loss of Mr. Barone's valuable placement in a witness protection program.
Where the motivation of one person to become a witness against another is the fruit or product of the latter's immunized testimony, evidence derived from the testimony of the former is barred. United States v. Kurzer, 534 F.2d 511 (2d Cir.1976), cited in [United States v. Quatermain, 613 F.2d 38, 39-41 (3d Cir.), cert. denied, 446 U.S. 954, 100 S.Ct. 2923, 64 L.Ed.2d 812 (1980)]. Where the testimony of a witness derives from a violation of an agreement under which the defendant gave his cooperation and made statements incriminating to himself and others, that witness's testimony should be suppressed under [Santobello v. New York, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971)] as a remedy for the due process violation.
[Id. at 1078-79.]
It is clear that the federal judge found that State law enforcement authorities used the information disclosed by defendant pursuant to the agreement.
Nevertheless, although stating that she had the power to enjoin "a state criminal prosecution in some cases," see, e.g., Younger v. Harris, 401 U.S. 37, 54, 91 S.Ct. 746, 755, 27 L.Ed.2d 669, 681 (1971) (permitting federal injunction only in unusual circumstances), Judge Shapiro declined to do so. 781 F. Supp. at 1079. The federal judge concluded:
Mr. Barone's rights under his plea agreement have been violated. Were this court not restrained by principles of comity and discretion, it would enjoin the New Jersey criminal prosecution against Mr. Barone, a remedy which the New Jersey court may certainly deem appropriate and within its power. Considering itself bound by such restraints, this court will direct the United States Attorney's Office and the Federal Bureau of Investigation to give no further assistance to the authorities of the State of New Jersey in their prosecution of Richard Barone, and direct the Department of Justice, including the United States Marshals Service, to make their best efforts to provide some form of witness protection at an appropriate time.
[Id.]
It was on this basis that defendant moved to dismiss the State indictment. The State trial judge took testimony to determine how and when New Jersey authorities obtained the information concerning defendant's involvement in the casino thefts. Following the hearing, the State judge stated that he had "trouble" with *115 Judge Shapiro's factual finding that defendant had made the statements concerning the casino thefts during the proffer session. The State judge referred to Judge Shapiro's factual finding that although Rochon took notes at the proffer session, the notes did not refer to the casino thefts. The State judge also found that there was no evidence, except for defendant's federal attorney's certification, that expressly revealed that the reference to the casino thefts was made at the proffer session. The State judge placed "very little reliance" on the attorney's certification because he was defendant's former attorney and "all he can remember is that large sums of money from the casinos was [sic] discussed." The judge found it was "more reasonable to believe" that defendant told no one about the casino thefts until he was cross-examined in the Merlino trial. The judge determined that defendant was not entitled to relief under the plea agreement because it covered only those crimes discussed at the proffer session, and the casino thefts had not been discussed at that time.
Based on the testimony taken at the hearing before him, the State judge concluded that:
It is clear from the testimony ... that New Jersey had no knowledge concerning any statements made by the defendant Barone at any proffer session and the knowledge gained by the New Jersey authorities came from either the [independent] detailed investigation made by [State] Investigator Carl Gravel or the investigation that showed that the defendant Barone made the admissions while under cross-examination at the federal trial of the Merlino and Barone defendant, and therefore, I cannot agree that any statements made by the defendant Barone were protected by any Fifth Amendment privilege or any other principles of law that have been set forth to me....
The judge therefore denied the motion to dismiss the indictment.

A.
Defendant now claims that he received transactional immunity as a result of his federal plea agreement and that even if the exact terms of the agreement did not confer transactional immunity, due process and fundamental fairness compel such a finding. He also contends that the State judge's conclusion that defendant did not *116 disclose his involvement in the casino thefts during the proffer session was not supported by the evidence and violated the principles of comity, and that, in any event, even if the agreement is viewed as granting only use immunity, the indictment should be dismissed because the State failed to show that its prosecution was totally independent of defendant's compelled admissions.
Preliminarily, the State claims that defendant should be estopped from arguing that the agreement constitutes a grant of immunity because defendant did not appeal Judge Shapiro's finding that the agreement was a promise not to prosecute, as opposed to a grant of immunity, and defendant agreed to be bound by Judge Shapiro's decision. We disagree. Even though Judge Shapiro found that defendant was not granted immunity, she granted defendant limited relief, and the chances of success in obtaining an injunction against the State prosecution had defendant appealed were minimal. See Younger v. Harris, supra. Moreover, the State's present contention serves to give greater breath to the scope of the federal hearing than the State advanced below as its justification for not seeking to participate. In any event, an estoppel cannot flow from the wording of the judge's opinion or defendant's failure to appeal the resulting judgment in his favor. Furthermore, we do not hold that defendant received transactional immunity or immunity from prosecution in New Jersey. As will be developed, we hold only that, in these circumstances, the State cannot challenge the federal judge's finding that the indictment for the casino thefts returned against him was derived from a breach of the federal agreement. Those charges must, therefore, be dismissed on that basis.

B.
We reject defendant's claim that he was granted transactional immunity by the federal prosecutor. "`Transactional immunity' ... means that the compelled witness will not be prosecuted at all for the criminal transaction about which he is compelled to testify." Butler v. State, 55 Md. App. 409, 462 A.2d 1230, 1235 *117 (Md. App. 1983). Because the Fifth Amendment requires the grant of testimonial or "use and fruits" immunity ("immunity from the use of compelled testimony, as well as evidence derived directly and indirectly therefrom") in exchange for compelled testimony, see Kastigar v. United States, 406 U.S. 441, 453, 92 S.Ct. 1653, 1661, 32 L.Ed.2d 212, 222 (1972); Zicarelli v. New Jersey State Commission of Investigation, 406 U.S. 472, 476, 92 S.Ct. 1670, 1673-74, 32 L.Ed.2d 234, 238 (1972), a grant of transactional immunity can flow only from a statute embodying legislative authority to grant it.[1] Claims that transactional immunity flows from the compelling of testimony even over a valid claim of privilege (much less an agreement) have been rejected. Kastigar, supra; Zicarelli, supra. See also State v. Strong, 110 N.J. 583, 591-96, 542 A.2d 866 (1988); State v. Kenny, 68 N.J. 17, 23-24, 342 A.2d 189 (1975).
However, there is a difference between the grant of any type immunity, which usually flows from statute and is usually granted by a judge (normally following the assertion of the Fifth Amendment) incident to a direction to testify, see State v. Strong, supra; In re Tuso, 73 N.J. 575, 376 A.2d 895 (1977); In re Addonizio, 53 N.J. 107, 248 A.2d 531 (1968), and a formal or informal agreement with a prosecutor (frequently resulting in the failure to warn or the witness' non-assertion of the privilege):
Formal immunity is dramatically distinguished from informal agreements that "partake of," "sound in," or somehow resemble formal immunity. Formal immunity is not necessarily the subject of a bargain and is frequently forced upon a reluctant witness against the witness's will. A witness is summoned to testify at a trial or before a grand jury. The witness claims the privilege against compelled *118 testimonial self-incrimination. The State, upon explicit statutory authorization, may then officially and upon the record confer a grant of the appropriate form of immunity upon the recalcitrant witness, whether that witness wishes it or not. The witness is then compelled to testify under threat of contempt, for there is no longer any danger that the compelled testimony could operate to incriminate.
Formal immunity, moreover, is never given in exchange for (1) cooperation, (2) information, or (3) even non-privileged testimony. The very notion of immunity has no existence outside the context of the constitutional privilege against compelled self-incrimination.... Although a quid pro quo of forbearing to prosecute in exchange for anything other than privileged testimony may resemble transactional immunity, it is not immunity.
[Butler v. State, supra, 55 Md. App. at 422, 462 A.2d at 1236.]
Here, defendant did not invoke his privilege against self-incrimination during a criminal or other proceeding. He was not directed by a judge or compelled to testify over a valid claim of privilege, or otherwise. He voluntarily bargained for an agreement with the federal government. The government did not force him to testify against his will, and no statutory immunity was invoked. Thus, the State is correct that this is not a case where formal immunity had been granted.
However, here the agreement was embodied in writing, the government made its agreement pursuant to Federal Rule 11(e), and the federal courts have approved the use of "informal" immunity agreements. United States v. Harvey, 869 F.2d 1439, 1444 (11th Cir.1989); United States v. Skalsky, 857 F.2d 172, 175 (3d Cir.1988). The informal agreements can provide for either transactional or testimonial ("use plus fruits") immunity, United States v. Harvey, supra, 869 F.2d at 1449, although under the latter, the witness may still be prosecuted for crimes about which he testifies if the government can prove that its evidence was derived from a source wholly independent of the compelled testimony. United States v. Quatermain, 613 F.2d 38, 40-43 (3d Cir.), cert. denied, 446 U.S. 954, 100 S.Ct. 2923, 64 L.Ed.2d 812 (1980). The agreement may be made in the context of a plea agreement, and "[a]lthough a plea agreement occurs in a criminal context, it remains contractual in nature and is to be analyzed under contract-law standards." United States v. Moscahlaidis, 868 F.2d 1357, 1361 (3d Cir.1989). Moreover, "[d]ue process requires the *119 government to adhere to the terms of any plea bargain or immunity agreement it makes." United States v. Harvey, supra, 869 F.2d at 1443. See also State v. Riley, 242 N.J. Super. 113, 119-20, 576 A.2d 39 (App.Div. 1990).
In Rowe v. Griffin, 676 F.2d 524 (11th Cir.1982), the federal Court of Appeals upheld the injunction of a state prosecution following a promise by state and federal law enforcement officers not to prosecute a paid informer who provided evidence in the prosecution of members of the Klu Klux Klan. The Court held that to achieve immunity from prosecution defendant must show "that (1) an agreement was made; (2) the defendant has performed on his side; and (3) the subsequent prosecution is directly related to offenses in which the defendant, pursuant to the agreement, either assisted with the investigation or testified for the government." Id. at 527-28. The state prosecution was enjoined, however, only because the State Attorney General had been a party to the agreement. 676 F.2d at 526. Following Griffin, it has been made clear, however, that "[u]nder settled precedent, one federal prosecutor cannot bind his or her counterpart in another district unless he or she has been given authority," United States v. Roberson, 872 F.2d 597, 611 (5th Cir.), cert. denied, 493 U.S. 861, 110 S.Ct. 175, 107 L.Ed.2d 131 (1989), and that "[i]f federal prosecutors cannot bind other federal prosecutors with their unauthorized acts, a state prosecutor a fortiori should not be able to do so." Ibid. The Roberson court also noted that "[i]f state agreements that immunize criminal defendants from state charges could bind federal prosecutors, state prosecutors would be able to usurp federal prosecutorial discretion." Ibid. Cf. United States v. Harvey, 791 F.2d 294, 302-03 (4th Cir.1986).
Given the scope of the Fifth Amendment protection against the use of compelled testimony and its fruits, as developed in Kastigar and Zicarelli, there is no reason to give greater protection to the breach of a promise not to prosecute. Formal transactional immunity may be given pursuant to a statute or judicial proceeding. See State v. Kenny, supra. See also United *120 States v. Camp, 72 F.3d 759 (9th Cir.1995) (self-incrimination not compelled under State transactional immunity agreement, and information given could be considered at federal sentencing); United States v. Eliason, 3 F.3d 1149, 1154-55 (7th Cir.1993) ("argument that information voluntarily provided during state plea negotiations results in immunity from federal prosecution is without merit"); United States v. Biaggi, 675 F. Supp. 790, 804 (S.D.N.Y. 1987) ("no considerations of federalism or of New York law ... require [federal court] to honor a grant of letter [non-statutory] immunity by a state prosecutor"); United States v. Addonizio, 313 F. Supp. 486, 494 (D.N.J. 1970), aff'd, 451 F.2d 49 (3d Cir.1971), cert. denied, 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972) (defendant's State grand jury testimony compelled over assertion of Fifth Amendment turned over to federal prosecutors did not prevent federal prosecution); Butler v. State, supra, 462 A.2d at 1236.
Defendant's arguments that the State is bound by the federal promise of non-prosecution are unpersuasive. Defendant relies on two cases, State v. Kenny, supra, 68 N.J. 17, 342 A.2d 189, and In re Ippolito, 75 N.J. 435, 383 A.2d 117 (1978), for the proposition that "[o]ur state courts recognize that a grant of transactional immunity by the Federal Government does immunize defendants in state court." However, Kenny involved testimony developed in federal court pursuant to a federal statutory grant of transactional immunity, and Ippolito merely implemented the fundamental principle that a witness could not be compelled to answer incriminating questions unless previously afforded immunity. See also In re Tuso, supra. Footnote 3 of Ippolito, 75 N.J. at 438, 383 A.2d 117, relied upon by defendant, does state that "[t]he immunity would extend to federal prosecution or prosecution in any other State as well." However, the footnote relates to constitutionally adequate "use plus fruits"  not transactional  immunity. Here, no formal statutory transactional immunity was granted. We, thus, reject defendant's contention that he cannot be prosecuted by the State of New Jersey for the theft offenses.

*121 C.
Whether a breach of the agreement occurred and resulted in the "use" of evidence derived from that breach, however, presents a different issue. Before us the prosecutor argues that the Federal District Judge's determination as to the facts are not binding because her conclusions resulted from proceedings in which only defendant and the United States Attorney participated and the issue was developed in "friendly proceedings" designed to enroll defendant into the witness protection program. While, for present purposes, we will assume that to be the case, the fact that the United States Attorney may have been helping the defendant gives rise at least to an inference that he concluded there was some breach of the agreement or that the State indictment was inconsistent with either his promise rendered to defendant or the best interests of law enforcement. In any event, the record before us indicates that the State prosecuting authorities had notice of the proceedings to be conducted before the federal judge, were aware of the issues involved, and, in fact, presented the federal judge with an affidavit from Investigator Gravel to the effect that the State's evidence was derived from independent sources.[2]
The Deputy Attorney General who presented this matter in State court explained to the State trial judge that she learned of the post-conviction proceedings before Judge Shapiro, and that she attended the first day's proceedings. The Deputy Attorney General explained:
With respect to the [] first hearing, my investigator, the primary investigator in this case, was on vacation. That was made clear to Judge Shapiro. It was also made clear to Judge Shapiro that should she wish him  should she wish to question him, he would be made available to her because he would be coming back into the State within the next couple of days. I never received any further inclination or any indication from Judge Shapiro that she wished to hear from him.
So, that is where we stand with respect to the State's position being put forth in that hearing.
*122 The State prosecutor further explained that she was not in attendance for the second day of testimony, but that was because the State never sought to become involved. According to the Deputy Attorney General:
The State did not defer with respect to these hearings that were held before Judge Shapiro. It did not defer in the sense that it was requested by the U.S. Attorney to defer. The reason being that the purpose of that hearing, the sole purpose of that hearing, was to determine if the federal government violated a federal plea agreement with Mr. Barone who was then a federal witness.
As such, Mr. Goldman explained to me that he did not wish the State to participate in any manner, because he did not want that hearing to be expanded. Given that that was my understanding of what that hearing was to be, the State indeed did sit back and just watch.
When asked by Mr. Goldman if I should submit or if he could submit the affidavit of Mr. Gravel, I agreed that that affidavit could indeed be submitted. However, it was made clear to Judge Shapiro at the time that Mr. Gravel, while on vacation for the first hearing, would be available shortly thereafter, and should any further testimony be needed, he would be available as would any other member of the State be made available.
I was never requested thereafter to produce Mr. Gravel. I was never requested thereafter to produce the then Chief of the section, John J. Smith, who made the decision to reactivate this case.
As such, there is nothing on the record before Judge Shapiro as to the motivation of the State of New Jersey, or as to the reasons why the State of New Jersey did what the State of New Jersey did.
With respect to the hearing that was held by Judge Shapiro, in that respect, I think it was a very narrow hearing. It was for one purpose and one purpose only. Judge Shapiro made her findings with respect to the fact that Mr. Barone, first of all, and most important, was not granted immunity. He was simply allowed to have a plea agreement with an agreement not to prosecute.
Undoubtedly, for good law enforcement purposes, the State prosecutor elected to cooperate with the United States Attorney and not to seek to intervene or participate in the proceedings she knew were directed to the source of the State's evidence and the impact of the federal agreement on the State prosecution. Having made that election, and having deferred to the United States Attorney, we conclude that the State could not seek to question the subsequent federal court fact-finding in State court.
We recognize that Judge Shapiro's order did not enjoin the State prosecution or purport to dismiss the State charges, but in our view her determination warranted some action by the State *123 law enforcement authorities in light of their knowledge of the proceedings pending before her. This record reflects no endeavor by the State to intervene, to formally participate or to seek reconsideration of the federal judge's decision once rendered.
In essence, while the Federal District Court in the exercise of comity declined to enjoin the State prosecution, we believe that, in the best interests of federal-state judicial relations, the State prosecutor in these circumstances should have endeavored to intervene or challenge in federal court the federal fact-findings which compel dismissal of the State prosecution, rather than sitting back and seeking to relitigate the issue in State court. While the State judge heard witnesses presented by the State, there is no question that defendant could not obtain access to, or present to the State court, the confidential FBI records made available to the federal judge in camera. In any event, the State prosecutor elected not to seek the opportunity to further participate in the federal proceedings, although presenting to the federal judge an affidavit of the lead State investigator who claimed in State court that the State indictment was based on wholly independent evidence. The federal judge reviewed that affidavit and other evidence not available or presented to the State judge. The State prosecutor could not elect to sit back, defer to the United States Attorney and thereafter challenge the federal ruling in State court only after its adverse impact became apparent.

IV.
We recognize that defendant was not given federal transactional or testimonial immunity by statute or judicial act, and that he received no promise that he would not be prosecuted by the State of New Jersey. We also recognize that, from a constitutional point of view, testimonial immunity protecting defendant from the use of what he said and anything derived therefrom would suffice even if he had been "compelled" to testify over a valid claim of privilege. Thus while, as a matter of law, a promise that "the government" will not prosecute cannot bind law *124 enforcement agencies outside the jurisdiction of the prosecutor who made the promise, here a federal judge found that the assurances given to defendant in exchange for his cooperation were not only breached, but that the breach resulted in the use of the information he provided to resurrect the State criminal investigation and the indictment of defendant for the crimes he disclosed. Such "use" requires dismissal of the resulting State charges.
We acknowledge the State's argument that the federal judge's findings of breach were made in a proceeding in which the State prosecutor did not appear or directly participate. But they were made in proceedings of which the State prosecuting attorney was aware, and in which she elected not to directly participate or seek to participate, either before the federal judge rendered her findings or by any endeavor to challenge them thereafter. We also recognize that the federal decision is not binding upon us as a matter of "federalism" or because we must defer to the federal courts (other than the Supreme Court). Younger v. Harris, supra, 401 U.S. at 43-45, 91 S.Ct. at 750-51, 27 L.Ed.2d at 675-76; State v. Coleman, 46 N.J. 16, 34-38, 214 A.2d 393 (1965), cert. denied, 383 U.S. 950, 86 S.Ct. 1210, 16 L.Ed.2d 212 (1966). See also State v. Moore, 122 N.J. 420, 431, 585 A.2d 864 (1991). Nevertheless, we hold that, as a matter of comity, the State judge should not have conducted an independent hearing on the same factual questions in these circumstances.
The convictions on counts nine, seventeen and nineteen are affirmed. The convictions on counts one, two and twelve are reversed.
NOTES
[1] It is not suggested that a State statute granting transactional immunity would have impact beyond that of a testimonial grant of immunity across State lines. Only a federal transactional grant can bind the States. State v. Kenny, 68 N.J. 17, 342 A.2d 189 (1975). Federal law no longer provides statutory grants of transactional immunity. See 18 U.S.C. §§ 6001-6005. See also Kastigar, supra, 406 U.S. at 452, 92 S.Ct. at 1660-61, 32 L.Ed.2d at 221; United States v. Harvey, 869 F.2d 1439, 1444 (11th Cir.1989). New Jersey provides statutory "use and derivative use" immunity under N.J.S.A. 2A:81-17.3. See State v. Strong, supra. See also N.J.S.A. 2A:81-71.2(a) regarding public officials.
[2] In her opinion, Judge Shapiro found that "Investigator Gravel's affidavit is too vague in certain relevant respects to have inherent credibility; he did not appear to testify at the recent hearings." 781 F. Supp. at 1076.